**David HOLLIS, Petitioner-Appellant,**

v.

**Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent-Appellee.**

**No. 258, Docket 77–2057.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1977.

Decided Jan. 3, 1978.

On Rehearing Feb. 17, 1978.

Howard B. Comet, Mineola, N. Y. (James J. McDonough and Michael J. Obus, Mineola, N. Y., of counsel), for petitioner-appellant.

Mark C. Rutzick, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., State of N. Y., and Samuel A. Hirshowitz, First. Asst. Atty. Gen., State of N. Y., New York City, of counsel), for respondent-appellee.

Before MOORE, FRIENDLY and TIMBERS, Circuit Judges.

FRIENDLY, Circuit Judge:

This well briefed and well argued habeas appeal raises some difficult questions of the constitutionality of the procedures accorded petitioner David Hollis with respect to his indeterminate sentence of one day to life under a New York statute, former New York Penal Law § 243, now repealed, which permitted such a sentence for sex offenders.

Hollis was indicted in Nassau County, N.Y., in August, 1964 in a three-count indictment charging attempted rape in the first degree and two counts of assault in the second degree including assault with intent to commit rape.[1] During trial in September, 1965, Hollis, in satisfaction of the indictment, pleaded guilty to one count of assault in the second degree with intent to commit rape.[2] At that time § 243 of the New York Penal Law provided:

---

1. The three counts all related to the same act.

2. The plea minutes seem decidedly inadequate under standards prevailing now or, we should suppose, even in 1965. Although the court informed Hollis of his liability to further punishment under the New York recidivist law, § 335–b of the then Code of Criminal Procedure, it did not explain the possible life sentence entailed bý a guilty plea to a charge of

Assault in the second degree is punishable by imprisonment in a penitentiary or state prison for a term not exceeding five years, or by a fine of not more than one thousand dollars, or both; provided, however, any person convicted of assault in the second degree for an assault upon another with intent to commit the felony of rape in the first degree, rape in the second degree, sodomy in the first degree, sodomy in the second degree or carnal abuse may be punished by imprisonment for an indeterminate term, the minimum of which shall be one day and the maximum of which shall be the duration of his natural life. As amended L.1950, c. 525, § 10, eff. April 1, 1950.

Section 2189–a specified:

No person convicted of a crime punishable in the discretion of the court with imprisonment for an indeterminate term, having a minimum of one day and a maximum of his natural life, shall be sentenced until a psychiatric examination shall have been made of him and a complete written report thereof shall have been submitted to the court. Such examination shall be made in the manner prescribed by sections six hundred fifty-nine, six hundred sixty, six hundred sixty-one and six hundred sixty-two–e of the code of criminal procedure. Such report shall include all facts and findings necessary to assist the court in imposing sentence. A copy thereof shall be transmitted by the clerk of the court to the warden or superintendent of the correctional institution to which the prisoner is committed. Added L.1950, c. 525, § 23; amended L.1951, c. 166, eff. July 1, 1951.

The reports rendered by the psychiatrists at that time are not before us. On December 8, 1965, Hollis received an indeterminate sentence of one day to life. No appeal was taken.

In 1967 the Supreme Court decided *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 1211, 18 L.Ed.2d 326. Specht had been convicted for taking indecent liberties,

under a Colorado statute that carried a maximum sentence of 10 years. A separate statute, the Sex Offenders Act, provided that if the trial court was "of the opinion that any . . . person [convicted of specified sex offenses], if at large, constitutes a threat of bodily harm to members of the public, or is an habitual offender and mentally ill," he might receive an indeterminate sentence of from one day to life. Like the New York Sex Offenders Law the Colorado statute required an examination by psychiatrists and a report to the judge but, as Mr. Justice Douglas said, "there was no hearing in the normal sense, no right of confrontation and so on." On review of a denial of federal habeas corpus, the Colorado warden relied on the holding in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), that the due process clause of the Fourteenth Amendment "did not require a judge to have hearings and to give a convicted person an opportunity to participate in those hearings when he came to determine the sentence to be imposed"— in that instance a sentence of death as against a jury's recommendation of life imprisonment. 386 U.S. at 606, 87 S.Ct. at 1211. The Court adhered to *Williams* but "decline[d] the invitation to extend it to this radically different situation." It stressed that the Colorado Sex Offenders Act "does not make the commission of a specified crime the basis for sentencing," as § 243 of New York Penal Law literally did, but rather made one conviction "the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill." After quoting with approval from the opinion of Judge Freedman in *United States ex rel. Gerchman v. Maroney*, 355 F.2d 302, 312 (3 Cir. 1966), dealing with a comparable Pennsylvania statute, of which more hereafter, the Court characterized invocation of the Colorado Sex Offenders Act as "the making of a new charge leading to criminal punishment" and cited

assault with intent to commit rape. However, petitioner has not sought release on the ground

that he did not understand the consequences of his guilty plea.

cases under recidivist statutes holding that a defendant "must receive reasonable notice and an opportunity to be heard," *Oyler v. Boles*, 368 U.S. 448, 452, 82 S.Ct. 501, 504, 7 L.Ed.2d 446 (1962); *Chandler v. Fretag*, 348 U.S. 3, 8, 75 S.Ct. 1, 99 L.Ed. 4 (1954). It concluded, 386 U.S. at 610, 87 S.Ct. at 1212, that under the Colorado Sex Offenders Act due process required that the defendant must "be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own. And there must be findings adequate to make meaningful any appeal that is allowed."

As indicated, *Specht* did not deal expressly with a sex offender indeterminate sentencing provision which, like New York's at the time, did not require proof of a new fact but on its face simply enlarged the court's sentencing discretion without any standards whatever. Had matters rested that way, it would have been arguable that even the items of procedural protection accorded to *Specht*, much less the additional ones sought by Hollis, were not here required, since the case would have continued to be attracted by *Williams*. However, that issue is of only academic interest in light of later developments in New York law.

In *People v. Bailey*, 21 N.Y.2d 588, 289 N.Y.S.2d 943, 237 N.E.2d 205 (1968), a case decided after repeal of the New York sentencing provision here in question, the Court of Appeals had before it appeals from indeterminate sentences by three sex offenders who complained both of lack of the procedure required by *Specht* and of inadequacy of the psychiatric reports under § 2189–a of the New York Penal Law. Acknowledging that "[a] literal reading of

the New York statutory scheme might lend support to the argument advanced by the People and accepted by the Appellate Division that the sentencing court has 'complete discretion' to sentence for one day to life," the court concluded that "[a]n examination of the statutory purpose as well as the weight of judicial authority indicate that the discretion of the sentencing Judge to mete out a one-day-to-life sentence is limited to those cases in which the record indicates some basis for a finding that the defendant is a danger to society or is capable of being benefited by the confinement envisaged under the statutory scheme." [3] The need for such an additional finding, the Court said, "clearly brings this case within the ambit of the *Specht* holding and entitles those sentenced under the statute to a hearing." The court therefore remanded all three cases for resentencing.[4]

Shortly after the *Bailey* decision, the Nassau County Court directed a new psychiatric examination of Hollis as a preliminary to a *Specht* hearing. The two examining psychiatrists apparently did not themselves report to the court; a report, allegedly based on their findings, was made by the chairman of the psychiatry department of Meadowbrook Hospital.[5] Later a hearing was held at which Hollis was represented by counsel. At the start of the hearing, counsel demanded a jury trial; the judge denied this. The psychiatrists who had examined Hollis were called by the People and were cross-examined. Hollis also testified. The judge thereafter handed down an opinion in which he found

> that the defendant is not capable of being returned to society; that he definitely would present a danger to society, if re-

---

**3.** The court relied particularly on *People v. Jackson*, 20 A.D.2d 170, 245 N.Y.S.2d 534 (1963). It also cited *People ex rel. Kaganovitch v. Wilkins*, 23 A.D.2d 178, 259 N.Y.S.2d 462 (1965); *People ex rel. Piatt v. La Vallee*, 26 A.D.2d 904, 274 N.Y.S.2d 475 (1966); and *People ex rel. Chunley v. Mancusi*, 26 A.D.2d 905, 274 N.Y.S.2d 477 (1966).

**4.** In two of the three cases the court found the psychiatric report inadequate. It is not altogether clear whether the resentencing that was

directed in these two cases made it mandatory to change the sentence to a fixed term or whether the People were to have an opportunity to submit new psychiatric reports.

**5.** In some respects the report goes beyond the testimony later given by the psychiatrists at the hearing. However, the report was not offered at the hearing and there is nothing to indicate that the judge gave any weight to it.

leased at this time, and that in a controlled environment, there is a possibility that he may be benefited by the treatment which he will be afforded.

Thereafter the court sentenced Hollis to an indeterminate term of one day to life.

Hollis appealed to the Appellate Division for the Second Department. He argued that the psychiatric report did not conform to the requirements of § 2189–a and *People v. Bailey, supra,* and also that he had been denied his constitutional rights in three respects: (1) that the court had refused to grant a jury trial; (2) "that the procedures prescribed for the psychiatric examination violated his privilege against self-incrimination as well as his right to have an attorney present during each and every stage of the criminal proceeding"; and (3) "that proof of his being capable of benefiting from confinement or of his being a danger to society should have been shown beyond a reasonable doubt and not merely by a preponderance of the evidence." The Appellate Division affirmed, 34 A.D.2d 786, 311 N.Y.S.2d 968 (1969), in a brief memorandum, saying merely:

> Defendant's main contention is that the psychiatric report relied upon by the re-sentencing court was "insufficient as a matter of law" to permit imposition of the one day to life sentence. The record developed at the hearing, including the psychiatric report, provided a sufficient basis upon which the court could exercise its discretion (cf. *People v. McCraw,* 33 A.D.2d 577, 305 N.Y.S.2d 299). It is our view that the sentence imposed was proper in the light of that record. We have also considered defendant's other contentions and find them to be without merit.

Leave to appeal to the Court of Appeals was denied.

Hollis thereafter filed a petition for habeas corpus in the District Court for the Eastern District of New York. Judge Platt denied this in an opinion. In the portion of this which dealt with the claim that due process required proof of his condition beyond a reasonable doubt, the opinion included the following:

> As to petitioner's claim that due process further requires that the applicable standard be proof "beyond a reasonable doubt", Mr. Justice (then Judge) Paul Kelly has filed an affidavit herein wherein he states that he applied the beyond a reasonable doubt standard at petitioner's re-sentencing hearing. While petitioner's attorney vigorously questions this sworn statement of Mr. Justice Kelly in an unsigned and unverified memorandum filed in opposition thereto, he has not served or filed any affidavit or other evidence which directly or indirectly refutes the same.
>
> Assuming *arguendo* that petitioner is correct in his contention that the applicable standard is "beyond a reasonable doubt", there would appear to have been no error committed at least at the State Court trial level. To the extent, if at all, that the State Appellate Courts may not have applied such standard on appeal in evaluating the sufficiency of the evidence to meet such standard as did Judge Kelly, petitioner's application for an appropriate writ would appear to be more properly addressed to the State Courts than to this Court. See 83 Harvard Law Review 1038, 1096 (lines 7–10).

A motion for reconsideration of this portion of the opinion was granted but the district court adhered to its original decision. In the same order, Hollis' motion for a certificate of probable cause was denied. This court granted the certificate.

### Discussion

The State argues that consideration of petitioner's three due process claims is foreclosed because they go beyond the specific list of constitutional rights to which the Supreme Court in *Specht* held a defendant to be entitled, all of which Hollis concededly was granted. Counsel for petitioner answers that such a negative inference from *Specht* would be unwarranted for two reasons: The first is that when *Specht* was decided in 1967, the Supreme Court had not yet determined that the due process clause required a state to accord a jury trial in

prosecutions for serious crimes, see *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and to adduce proof in a criminal trial that would demonstrate the defendant's guilt beyond a reasonable doubt, *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The second is that Specht had not claimed any of the constitutional rights here in controversy and the Court consequently cannot be assumed to have passed adversely on the existence of rights that had not been asserted.

The situation may not be quite so clear as petitioner claims. The same Court that decided *Specht* frequently indulged in "guideline" opinions going well beyond the issues presented to it. See, e. g., *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); and particularly *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Moreover, the *Specht* Court's examination of the opinion of the Third Circuit in *United States ex rel. Gerchman v. Maroney, supra,* 355 F.2d 302, must have made it acutely aware of potential constitutional claims beyond those which it specifically sustained. In the lead opinion in *Gerchman,* after holding that the defendant's "constitutional rights were violated by the failure to afford him the opportunity to confront and cross-examine the witnesses against him," 355 F.2d at 313, Judge Freedman went on to consider Gerchman's claim "that due process was violated by the denial of the right to trial by jury." *Id.* He refrained from deciding this, believing that the issue should first be considered by the Pennsylvania courts in the new trial that would be required in any event if Pennsylvania should persist in invoking its Sex Offender Law against Gerchman. His two colleagues would have decided the jury trial issue in the negative, apparently on what turned out to be a mistaken view that the Fourteenth Amendment did not require a jury trial in state criminal proceedings, 335 F.2d at 315–16. It is thus arguable that if

the author of *Specht* had thought that, depending on the subsequent course of Supreme Court decisions, persons like Specht might be entitled to a jury trial, he would at least have mentioned the possibility. However, for the purposes of this opinion, we prefer to accept Hollis' contention and to assume *arguendo* that *Specht* does not have the preclusive effect claimed by the State. At the same time we reject any claim that the Court's approving quotation, 386 U.S. at 609–10, 87 S.Ct. at 1212 of a passage from Judge Freedman's opinion containing the phrase "the full panoply of the relevant protections which due process guarantees in state criminal proceedings" decides in Hollis' favor issues which, on his own submission, were not before the Supreme Court at all.

■ (1) Hollis' claims that his examination by the psychiatrists violated his rights against self-incrimination and to the assistance of counsel are without merit. The self-incrimination privilege protects only against the compulsion of incriminating testimonial declarations, *Fisher v. United States,* 425 U.S. 391, 409, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Beattie,* 522 F.2d 267, 269–70 (2 Cir. 1975), *cert. denied on Beattie's petition and granted on Government's petition,* 425 U.S. 967, 970, 96 S.Ct. 2163, 48 L.Ed.2d 791 (1976), see opinion on remand, *United States v. Beattie,* 541 F.2d 329 (2 Cir. 1976). As Mr. Justice White said in *Fisher,* 425 U.S. at 399, 96 S.Ct. at 1575, the Court has never "applied the Fifth Amendment to prevent the otherwise proper acquisition or use of evidence which, in the Court's view, did not involve compelled testimonial self-incrimination of some sort." [6] The requirement is two-fold: the compulsion must be of testimony, and the testimony must have a tendency to show guilt. The psychiatrists' interrogation of Hollis on subjects presenting no threat of disclosure of prosecutable crimes, in the belief that the substance of Hollis' responses or the way in which he gave them might

---

**6.** The Court said also "that the Fifth Amendment * * * applies only when the accused is compelled to make a *testimonial* communica-

tion that is incriminating." 425 U.S. at 408, 96 S.Ct. at 1579 (emphasis in original).

cast light on what manner of man he was, involved no "compelled testimonial self-incrimination" even though the consequence might be more severe punishment. The mere fact that interrogation is the typical method for conducting psychiatric evaluations does not significantly differentiate the case from other instances where the Supreme Court has held that a defendant may be required to cooperate even with respect to the issue of guilt, e. g., by giving blood samples, *Schmerber v. California,* 384 U.S. 757, 763, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), handwriting or voice exemplars, *Gilbert v. California,* 388 U.S. 263, 265–67, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *United States v. Wade,* 388 U.S. 218, 222–23, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1972), or donning a blouse worn by the perpetrator of the crime, *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); see *Fisher, supra,* 425 U.S. at 408, 96 S.Ct. 1569. Lower federal courts and state courts have held that interrogation directed to determining sanity does not violate the self-incrimination privilege, even in cases where the inquiry was made before an insanity defense was pleaded, see 8 Wigmore, Evidence § 2265 at 399 and cases cited in fn. 12 (McNaughton rev. 1961 and 1975 supp.). While the cases reaching the same result after a defendant has indicated an intention to rely on the insanity defense and to call psychiatrists on his own behalf, see *Pope v. United States,* 372 F.2d 710, 717–21 (8 Cir. 1967) (*en banc,* Blackmun, *J.*), *cert. denied,* 401 U.S. 949, 91 S.Ct. 953, 28 L.Ed.2d 232 (1971); *Alexander v. United States,* 380 F.2d 33 (8 Cir. 1967); *United States v. Albright,* 388 F.2d 719, 722–23 (4 Cir. 1968); and our own *United States v. Baird,* 414 F.2d 700, 709 (1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970), depend in part on notions of waiver or estoppel, they also rely on the distinction between an effort "to prove by evidence wrested from a defendant whether he is guilty as charged" and evidence intended only "to prove whether a defendant possesses the requisite mentality to be guilty as charged," *United States v.*

*Albright, supra,* 388 F.2d at 723. Judge Anderson said for this court in *Baird, supra,* 414 F.2d at 709, that compelled statements to a psychiatrist relevant to a defendant's mental condition "may be considered as 'real or physical evidence' rather than as 'communications' or 'testimony' within the meaning of *Schmerber v. California,"* supra, 384 U.S. at 763–64, 86 S.Ct. 1826. The present case is *a fortiori* to the insanity defense cases since Hollis was not interrogated on any subjects relating to guilt; he already stood convicted of the crime here at issue and the only other substantial crime about which he was questioned was a Massachusetts sex offense on which he had long since served his sentence. We do not understand the State to assert that a defendant who was the subject of a psychiatric examination under § 2189–a could have been required to disclose evidence tending to show himself guilty of other crimes still open to prosecution. Since Hollis' appearing before the psychiatrists and answering their questions thus was neither testimonial nor incriminating, we do not need to consider whether his doing this without objection operated as a waiver of any privilege he might have had.

In passing upon the question of entitlement to counsel at a psychiatric examination, courts have had to decide whether the issue is governed by one or the other of two cases decided by the Supreme Court on the same day in opinions by the same Justice, *United States v. Wade,* 388 U.S. 218, 223–27, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (counsel must be provided at post-arraignment or post-indictment lineups), and *Gilbert v. California,* 388 U.S. 263, 267, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (counsel need not be provided at post-arraignment or post-indictment taking of handwriting exemplars). See generally *Moore v. Illinois,* —— U.S. ——, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977). We addressed that issue in *Baird* in connection with a government psychiatric examination incident to the insanity defense and held that *Wade* did not control, 414 F.2d at 711. Judge Anderson there stated that a psychiatric examination was

not "the kind of critical stage in the proceedings at which the assistance of counsel was needed or at which counsel could make a useful contribution." Instead "the presence of a third party, such as counsel or a stenographer, at such an examination tends to destroy the effectiveness of the interview." Other courts have taken the same view. *United States v. Albright, supra,* 388 F.2d at 726–27; *United States ex rel. Wax v. Pate,* 409 F.2d 498 (7 Cir.), *cert. denied,* 396 U.S. 830, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969); *State v. Whitlaw,* 45 N.J. 3, 210 A.2d 763 (1965). We see no basis for a different rule where the psychiatric examination is incident to the extent of punishment. As Chief Judge Haynsworth said in *Tippett v. State of Maryland,* 436 F.2d 1153, 1158 (4 Cir. 1971), *cert. dismissed,* 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972), in dealing with the Maryland Defective Delinquents Act,

> It is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.

See also *Gomes v. Gaughan,* 471 F.2d 794, 799 (1 Cir. 1973) (sex offender statute).

■ (2) We likewise reject Hollis' claim that the due process clause of the Fourteenth Amendment, as construed in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968), requires that he be given a jury trial in the post-conviction procedures which *People v. Bailey, supra,* directed in order to comply with its reading of *Specht.*[7] *Duncan* required the states to afford a jury trial on the issue of guilt "in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." The decision was not predicated on a view that the jury was essential to a fair and equitable criminal process—a position which the Court expressly disclaimed, 391 U.S. at 149–

50 n.14, 88 S.Ct. 1448. Jury trial rather was required because it was "fundamental in the context of the criminal processes maintained by the American States." *Id.* This conclusion was supported by extensive references to history. The Court cited Blackstone's statement, 4 Commentaries on the Law of England 349 (Cooley ed. 1899), that "the founders of the English law have, with excellent forecast, contrived that . . . the truth of every accusation, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous sufferage of twelve of his equals and neighbors, indifferently chosen and superior to all suspicion." The Court proceeded to engage in a review of the history on this side of the Atlantic, culminating in the statement, 391 U.S. 154, 88 S.Ct. 1450 that:

> The laws of every State guarantee a right to jury trial in serious criminal cases; no State has dispensed with it; nor are there significant movements underway to do so.

For these and other reasons the due process clause of the Fourteenth Amendment was read as making applicable to the states the criminal jury trial command of the Sixth.

Despite the Court's statement in *Specht,* 386 U.S. at 610, 87 S.Ct. at 1212, that invocation of the Colorado Sex Offenders Act "means the making of a new charge leading to criminal punishment" and its approving quotation, 386 U.S. at 609, 87 S.Ct. 1209, of a similar statement by the Third Circuit concerning the Pennsylvania statute at issue in *Gerchman, supra,* 355 F.2d 302, the proceedings under § 2319–a directed in *People v. Bailey* contain many of the earmarks of sentencing procedures. The defendant has already been found guilty of the crime which prompted his incarceration; the sole remaining question is the concededly important one of the degree of his punishment. Indeed, it seems to us, as it evidently did to the New York Court of Appeals in *Bailey,*

---

7. Hollis has not argued that refusal of a jury trial was a denial of equal protection because New York affords a jury trial in civil commitment of the mentally ill, N.Y. Mental Hygiene Law § 31.35. See *United States ex rel. Hayden v. Zelker,* 506 F.2d 1228, 1230 (2 Cir. 1974). See also *Humphrey v. Cady,* 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972).

that the emphasis in *Specht* on the separateness of the Colorado Sex Offenders Act was mainly an effort to avoid what may have been an overreading of *Williams v. New York, supra,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337, to mean that the due process clause had no application to mere sentencing. A less formalistic basis of distinction would have been that where a higher sentence requires proof of a fact not established in the criminal trial, rather than the judge's overall assessment of the defendant, the sentencing is subject to certain due process guarantees with respect to proof of the critical fact. We thus regard the post-trial proceeding both in *Specht* and here as being, in their real effect, sentencing.

The tradition with respect to the jury's role in sentencing has been quite different from that relating to its role in the determination of guilt. The President's Commission on Law Enforcement and Administration of Justice (1967) reported at p. 1350:

Although a majority of States permit the jury to recommend or fix punishment at life imprisonment in capital cases, in about one-quarter of the States the jury determines the type and length of punishment for some or all offenses. The jury's sentencing power in most of these States is limited to cases in which it has determined the guilt of the defendant, but in a few States jury sentencing is available at the option of a defendant who pleads guilty, and in Tennessee the jury is required to fix the sentence in all cases. Where the sentence is imposed by a jury, the judge's role usually is confined to modifying a legal but excessive sentence or to conforming an illegal sentence to the statutory limits.

The Report did not consider the practice to be desirable. Several of its reasons are pertinent here. "Sentencing is a job for experts, and juries do not have the opportunity to develop expertise in this extremely complex area." And since sentencing normally cannot proceed without taking time to assemble data in regard to the defendant, "the jury would have to be reassembled after the report was prepared or a new jury would have to be impaneled."

We are wholly unconvinced that even if the *Specht* Court had had the benefit of the later *Duncan* decision, it would have required Colorado to afford a jury trial under its Sex Offenders Act. One reason is the difference in history and tradition recounted above; the importance of this was underscored in *McKeiver v. Pennsylvania*, 403 U.S. 528, 548, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), where, particularly due to such a difference in history, the Supreme Court held there was no right to a jury trial at juvenile delinquency proceedings despite its holding in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), that the due process clause applies to such proceedings. A second consists of the considerations quoted from the Task Force Report. A third is the difference in the jury's office. There still is validity in the distinction drawn by Mr. Justice Black in *Williams*, 337 U.S. at 246–47, 69 S.Ct. at 1083, between the trial's role of determining "whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused," using "rules of evidence . . . which narrowly confine the trial contest to evidence that is strictly relevant to the particular offense charged," and the task of determining whether a defendant is a danger to society or will benefit from institutional treatment. We need not determine whether, as a district judge in this circuit has recently held, *United States v. Fatico*, 441 F.Supp. 1285 (E.D. N.Y., 1977) (Weinstein, *J.*), *Williams* has been qualified by other Supreme Court decisions even on the precise point there decided. There is no authority binding upon us which holds that the procedure in proceedings relating solely to punishment, even when an additional fact has to be established, must conform precisely to those in proceedings relating to guilt, and we see no basis in principle for so holding. Although we cannot agree with the State that a jury is inherently incompetent to decide whether "the defendant is a danger to society or is capable of being benefited by the confinement envisaged under the statutory

scheme"—the issues framed by *Bailey*[8]—a jury does not have the special fitness for making such a predictive determination from evidence that may cover a defendant's entire life that it does for deciding with respect to the facts of discrete past conduct.

(3) Hollis' final point is that, under *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), due process required that he not be sentenced under § 243 unless the issues framed in *Bailey* were found against him beyond a reasonable doubt.

■ Preliminarily we reject the State's contention that this point has been disposed of by the affidavit of the state judge who conducted the 1969 hearing. While the district judge's desire to get to the root of the matter was commendable, the procedure he adopted for doing this was not. If inquiry was to be made in 1977 with respect to the state judge's mental processes in 1969, this should have been done in open court with Hollis having the right of cross-examination, not by an affidavit solicited by the State at the district judge's request. Moreover, while the state judge said he "unhesitatingly state[d] that the standard of proof required by me in the conduct of this Hearing was on the basis of 'Beyond a reasonable doubt,'" this was because, in light of his experience as a county judge handling nothing but criminal matters and as an attorney who had specialized in criminal law, "it would have been beyond my comprehension to have decided it on any other basis." Although we are certain the affidavit was given in the best of faith, it contrasts rather strangely with some of the language the judge had used in 1969, see p. 689 *supra*, as well as with the *Bailey* court's simple command that there must be "*some* basis for a finding . . . ," 289 N.Y.S.2d at 946, 237 N.E.2d at 207 (emphasis added), which was the position taken by the District Attorney for Nassau County in *People v. McCraw*, 33 A.D.2d 577, 305 N.Y.S.2d 299 (1969), aff'd, 27 N.Y.2d 652, 313 N.Y.S.2d 870 (1970), and by the Appellate Division both in *McCraw* and in this case ("a sufficient basis upon which the court could exercise its discretion"). We shall therefore disregard the state judge's affidavit.

■ The letter of *In re Winship* does not cover Hollis' case. The Court spoke of "the requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt," 397 U.S. at 361, 90 S.Ct. at 1071, and followed this by a quotation phrasing the requirement "as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt," *id.*, quoting McCormick, Evidence § 321, pp. 681–682 (1954). Later it spoke of the standard as "a prime instrument for reducing the risk of convictions resting on factual error," 397 U.S. at 363, 90 S.Ct. at 1072, of it being critical "that the moral force of the criminal law not be diluted by a standard of proof that leaves men in doubt whether innocent men are being condemned," 397 U.S. at 364, 90 S.Ct. at 1072, and of the importance "in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a

---

**8.** Several states have provided for jury trial of such issues, Ill.Stat.Ann., ch. 38, § 105–5 (1972); Ore.Rev.Stat. § 426.630 (1971); Iowa Code Ann. § 225A.9 (1969); Missouri Stat.Ann. § 202.720 (1972). Others have not, Florida Stat.Ann. § 917.18 (1973); N.H.Rev.Stat.Ann. § 173–A:4 (1975).

Many states afford a jury trial of disputed factual issues under recidivist statutes. See, e. g., Calif.Pen.Code § 667.5(d) (1977); N.J.Stat. Ann. § 2A:85–13 (1969). This was the case with the Tennessee and West Virginia statutes examined by the Court in *Chandler v. Fretag*, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954), and *Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962), which were cited by the *Specht* Court for the point that the defendant must receive reasonable notice and an opportunity to be heard. In *Quesnell v. State*, 83 Wash.2d 224, 517 P.2d 568 (1974), and *People v. Feagley*, 14 Cal.3d 338, 121 Cal.Rptr. 509, 535 P.2d 373 (1975), state supreme courts held that the right to trial by jury is guaranteed in sex offender proceedings. In the former, however, the only federal ground cited was equal protection, and in the latter the court relied on a guarantee of jury trial in mental illness cases found in the state constitution and statutes. In *Doremus v. Farrell*, 407 F.Supp. 509, 516 (D.Neb.1975), it was held that the jury trial right did not extend to civil commitment proceedings.

criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *Id.* Finally, the holding of Part I of the opinion was stated as being "that the Due Process Clause protects the accused *against conviction* except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* (emphasis added). In light of all this, and of our earlier discussion, p. 692, we do not believe that the *Specht* Court's reference to the Colorado Sex Offenders Act as the "making of a new charge leading to criminal punishment" necessarily implicates the later decision in *Winship.* We would not so readily reject arguments against extending the beyond a reasonable doubt standard to the issues framed by *Bailey* or similar ones concerning other types of statutes where the questions are a person's character and the prospects for his future conduct, as the Seventh Circuit did with respect to the Illinois Sexually Dangerous Persons Act[9] in *United States ex rel. Stachulak v. Coughlin,* 520 F.2d 931 (1975), *cert. denied,* 424 U.S. 947, 96 S.Ct. 1419, 47 L.Ed.2d 354 (1976). To require proof of such elements beyond a reasonable doubt would either prevent the application of such statutes except in the most extreme cases or invite hypocrisy on the part of judges or juries.[10] As Judge Sobeloff said in *Tippett v. State of Maryland, supra,* 436 F.2d at 1165, with respect to the Maryland Defective Delinquents Act:

> It must be recognized, however, that as to the ultimate issue of the inmate's dangerousness, the beyond a reasonable doubt standard may in practical operation be too onerous. After all, the ultimate issue is not as in a criminal case whether an alleged act was committed or event occurred, but the much more subjective issue of the individual's mental and emotional character. Such a subjective judgment cannot ordinarily attain the same "state of certitude" demanded in criminal cases.

On the other hand, we are convinced, as Judge Sobeloff suggested in *Tippett, id.* & n. 10, that even if the beyond a reasonable doubt standard does not fit the kind of determination here required, the "some basis" standard of *Bailey* is insufficient. The State was bound to make out its case that Hollis was "a danger to society or [was] capable of being benefited by the confinement envisaged under the statutory scheme" by "clear, unequivocal, and convincing evidence." Cf. *Woodby v. INS,* 385 U.S. 276, 285, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation). Nothing less would

---

**9.** This statute subjected a sexual psychopath who had not been convicted of any crime to commitment in the custody of the Director of Corrections until he could prove he was no longer sexually dangerous. Judicial opinion regarding the proper standard of proof under similar statutes has been greatly divided. Three state courts of last resort have held that the beyond a reasonable doubt standard must be employed in sex offender proceedings, *People v. Burnick,* 14 Cal.3d 306, 121 Cal.Rptr. 488, 535 P.2d 352 (1975); *In re Andrews,* 334 N.E.2d 15 (Mass.1974); *People v. Pembrock,* 62 Ill.2d 317, 342 N.E.2d 28 (1976), although the Illinois case, which follows *Stachulak, supra,* may be distinguished since under the Illinois statute the sex offender proceeding was in lieu of criminal prosecution and therefore no criminal conviction occurred first. Other courts have held the beyond a reasonable doubt standard to be required in civil commitment cases, although these, too, involve no prior criminal adjudication. See *In re Ballay,* 157 U.S.App.D.C. 59, 482 F.2d 648 (1973); *Suzuki v. Quisenberry,* 411 F.Supp. 1113 (D.Hawaii 1976); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972), va-

cated on other grounds, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974). Still other courts have approved standards in civil commitment cases less stringent than beyond a reasonable doubt. In *French v. Blackburn,* 428 F.Supp. 1351 (M.D.N.C.1977), and *Doremus v. Farrell,* 407 F.Supp. 509 (D.Neb.1975), district courts held the beyond a reasonable doubt standard not to be required, approving "clear, cogent and convincing" and "clear and convincing" standards. In *Stamus v. Leonhardt,* 414 F.Supp. 439 (S.D.Iowa 1976), a similar standard was required, the court finding preponderance alone to be insufficient.

**10.** Since the proceedings here at issue did not involve any element of a crime, there is no need for us to consider how the Supreme Court's holdings in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and in *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), are to be reconciled. See *Farrell v. Czarnetzky,* 566 F.2d 381 (2 Cir., 1977).

accord due process to a man, otherwise sentenceable for a maximum of five years, who instead was being sentenced to an indeterminate period of one day to life. The record shows that the evidence produced at Hollis' hearing did not meet that test.

■ The state judge's decision itself demonstrates the absence of "clear, unequivocal and convincing evidence" that Hollis was "capable of being benefited" by confinement. He found only "that in a continued controlled environment, there is a possibility that he may be benefited by the treatment which he will be afforded." In contrast he did find that Hollis "definitely would present a danger to society if released at this time." Our examination of the evidence on that issue indicates it was far from clear and convincing. The psychiatric examination consisted of a 45-minute interview by two psychiatrists. The only sex offenses revealed were abuse of a female child in Massachusetts in 1954 and the offense in 1964 to which Hollis had pleaded guilty. Hollis did not deny the latter but attempted somewhat to mitigate its seriousness by saying that the woman had been his paramour and reported him because he later spurned her. One doctor thought that Hollis' making this claim of what surely is not an unknown phenomenon was a point against him. The only other discussion relating to sex was that Hollis had twice been married; that he had lived with one of the women before marriage, for which he was brought up on a charge of "cohabiting"—a charge that has a rather archaic sound today—and later left her; and that the attack on the child had occurred at a time when Hollis was married. Although one of the psychiatrists said that he might consider Hollis' leaving his wife to be "sadistic," he quickly added that he "would say it is not too sadistic." The other psychiatrist was even less positive. He contented himself with saying that it was impossible to predict Hollis' behavior outside of a structured environment. The psychiatrists made no study of Hollis' personality structure

beyond questioning him and examining the probation report, which was ultimately excluded from evidence except insofar as it found its way into the psychiatrists' testimony; they also did not examine his prison record. About all their testimony adds up to is that Hollis had committed two sex offenses, separated by an interval of ten years; that he was less likely to commit sex offenses of a heterosexual character if he were kept away from females than if he were not; and that there was a possibility that he might benefit from treatment of an undescribed sort. Even without considering Hollis' own testimony that he had become a changed man during his years at the Clinton penitentiary, had written various articles for magazines, and had contributed his earnings to the aid of retarded children, this was not by any means "clear, unequivocal, and convincing evidence."

We therefore reverse the order of the district court and direct issuance of the writ. We have considered whether this direction should be conditional or unconditional and have decided in favor of the latter. Hollis was given an indeterminate sentence in 1965, which concededly was a denial of due process under the combined effects of *Specht* and *Bailey.* The State had an opportunity to rectify this by producing sufficient evidence in 1969; it did not do so. Hollis has now served a dozen years [11] for a crime for which, apart from the sex offender proviso of § 243, would have entailed a maximum sentence of five years. Since the State has not called our attention to any developments since 1969 that would confirm the psychiatrists' opinion that Hollis is a danger to society, we need not consider whether these would be relevant.

So ordered.

## ON PETITION FOR REHEARING

PER CURIAM:

The State's petition for rehearing filed on January 17, 1978 afforded no basis for re-

---

11. Hollis was paroled in 1972 but was returned to prison with a new sentence after he was convicted of attempted possession of a forged instrument. That new sentence has expired.

consideration of our opinion. However, on February 1, 1978, Assistant Attorney General Rutzick filed a "most urgent motion to supplement the record on appeal" to include a report by a parole officer dated October 9, 1975. This stated, among other things, that after Hollis had been paroled on September 16, 1975, he had assaulted a woman friend with whom he was staying in Buffalo, N.Y., and had made sexual threats or advances toward her minor son and daughter. Hollis denies the truth of these allegations. We are seriously disturbed at the failure of the State, which should have been familiar with this material as a result of an attack by Hollis on the revocation of his parole in the Supreme Court of New York for Wyoming County and in the Appellate Division for the Fourth Department, to have informed the District Court or this court about it, and we find altogether lame the excuses proffered by the Assistant Attorney General, to wit, that the State had not expected us to review the evidence concerning Hollis. However, the charges that Hollis attempted to engage in sexual offenses immediately upon his release on parole in 1975 are so disquieting that the interests of justice require an evidentiary hearing to determine their truth.

Our original opinion unconditionally directed the issuance of the writ, noting, *inter alia,* that "the State has not called our attention to any developments since 1969 that would confirm the psychiatrists' opinion that Hollis is a danger to society  .  .  .." Our attention has now been called to such information, albeit belatedly, and we therefore modify the final paragraph of our opinion so as to direct issuance of the writ unless the State commences within sixty (60) days a new *Bailey* hearing, including but not necessarily limited to the charges made in the parole report. The determination at such hearing shall comport with the requirement of proof by clear, unequivocal and convincing evidence set out in our opinion.

Accordingly, the State's motion to supplement the record in this court is denied. Its petition for rehearing is granted to the extent here indicated and is otherwise denied.