STATE OF CONNECTICUT *v.* ROBERT KALMAN
(AC 23653)

Foti, Dranginis and McDonald, Js.

Argued December 6, 2004—officially released March 22, 2005

*Richard E. Condon, Jr.*, assistant public defender, for the appellant (acquittee).

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Richard L. Palombo, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The acquittee, Robert Kalman, appeals from the judgment of the trial court committing him to the jurisdiction of the psychiatric security review board (board) for a term of thirty-five years and ordering him confined under maximum security conditions at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting) pursuant to General Statutes § 17a-582. A jury found the acquittee not guilty of criminal charges[1] by reason of mental defect or disease pursuant to General Statutes § 53a-13.[2] On appeal, the acquittee

[1] The acquittee was charged with one count of illegal possession of explosives in violation of General Statutes § 29-348, one count of possession of narcotics with the intent to sell in violation of General Statutes § 21a-277 (a), one count of operating a drug factory in violation of General Statutes § 21a-277 (c), two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (1) and one count of failure to appear in the first degree in violation of General Statutes § 53a-172. The jury was unable to reach a verdict as to the counts of possession of narcotics with intent to sell and operating a drug factory, and the court declared a mistrial on those counts. The jury found the acquittee not guilty of the remaining counts by reason of mental defect or disease.

[2] General Statutes § 53a-13 provides in relevant part: "(a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity,

claims that the trial court (1) denied him due process of law by failing to apply the civil commitment standard regarding mental illness and psychiatric disabilities, (2) committed plain error and deprived him of the right to due process by failing to comply with § 17a-582 and (3) ordered him confined under maximum security conditions on the basis of insufficient evidence. We affirm the judgment of the trial court.

After the jury found the acquittee not guilty of certain charges on the basis of mental defect or disease,[3] the court committed him to the custody of the commissioner of mental health and addiction services (mental

as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. . . ."

[3] The jury reasonably could have found the following relevant facts. The acquittee, a naturalized citizen, was born in Romania in 1970. His father was a violent alcoholic. As a teenager, the acquittee had been institutionalized for psychiatric treatment. In 1989, his family emigrated to the United States and he found employment. He was married in 1994, but divorced his wife in 1997 when she had an abortion, despite his objection. As a result of the divorce, the acquittee consumed large quantities of alcohol and his mental health deteriorated. He experienced racing thoughts, felt as if everyone were against him and heard ringing in his ears. He later developed a relationship with Danielle LeBlanc. LeBlanc and her two children moved into the acquittee's home, and she had a child with him.

In March, 2000, George Nobile, an inspector in the office of the chief state's attorney, informed the acquittee of threats made against him by members of a motorcycle gang. In response to the information, the acquittee again drank excessive amounts of alcohol and believed that he was being followed. To protect himself, he purchased a shotgun and stood guard at his house, which is secluded in a wooded area. He used cocaine to stay awake to be vigilant. Whenever a motorcycle passed the acquittee's house, he got his shotgun and ran into a wooded area, waiting for the motorcycle gang to arrive. LeBlanc described him as paranoid and obsessive about everything, not just the motorcycle gang. One night, when he was particularly drunk, he fired a gunshot into the air and hid in the wooded area. In addition to purchasing the shotgun, the acquittee acquired explosives and an AK-47 rifle, but failed to get the necessary permits. He intended to use the explosives as revenge against the motorcycle gang in the event that his family was harmed.

On June 4, 2000, the acquittee had an argument with members of a motorcycle gang at a bar in New Haven. He left and returned with his loaded AK-

health commissioner) for an evaluation. The court held

47, which he used to threaten the patrons. The acquittee did not seek police assistance before he confronted the motorcycle gang because he wanted to resolve the matter himself.

On the basis of the acquittee's criminal history, threatening behavior, acts of violence and abuse of illegal drugs and alcohol, George Dillon, chief inspector of the criminal justice division of the office of the state's attorney, obtained a warrant to search the acquittee's home. Dillon believed that the acquittee posed an imminent danger to others. On the morning of June 8, 2000, Dillon, Nobile and police officers executed the warrant. When the police arrived at his home, the acquittee and LeBlanc's thirteen year old daughter were leaving in his motor vehicle. When the police entered the house, they found LeBlanc's fourteen year old son asleep on a couch.

As a result of their search, the police found explosive devices, cocaine and drug paraphernalia. In the garage, they found gasoline containers and a fifty gallon drum overflowing with liquor. The acquittee told the police that he was responsible for all of the items seized from his home. He was arrested and released on an appearance bond, but failed to appear in court on September 19, 2000.

The night of September 23, 2000, the acquittee repeatedly viewed the motion picture "Dead Man Walking" and used a telephone "about 100 times," according to LeBlanc. At approximately 5:30 a.m. on September 24, 2000, he telephoned Nobile at home and told Nobile that he had ruined the acquittee's life and, consequently, that the acquittee would have "to take care of business." The acquittee telephoned Nobile again and told him that he had ruined his life by searching his house and that he knew where Nobile lived. Nobile telephoned the acquittee's residence and spoke to LeBlanc. The acquittee was not present; LeBlanc believed that he had been drinking all night.

The acquittee again telephoned Nobile, told him that he had ruined his life and asked to meet with him at the courthouse in New Haven. Nobile agreed to meet the acquittee. Nobile and Dillon surveilled the courthouse and saw a suspicious object in front of the doors. The New Haven police removed the object, which was nothing more than a Romanian flag with a homemade cross attached to it.

Throughout the day, LeBlanc had several telephone conversations with Nobile during which she told him that the acquittee might harm himself, as he was in possession of mercury crystals. Nobile advised LeBlanc to urge the acquittee to go to a hospital. LeBlanc later informed Nobile that the acquittee wanted Nobile to meet him at Yale-New Haven Hospital. Dillon and Nobile went to the hospital and met with LeBlanc, who informed them that the acquittee had a plastic container filled with the mercury crystals in his mouth. The acquittee threatened to bite the container if he were "pushed" hard enough. The acquittee trusted Nobile and talked with him. When Nobile saw him, the disheveled acquittee was lying on a stretcher, restrained. He was wearing a shirt on which the words dead man walking

a hearing in September, 2002, pursuant to § 17a-582 (d),

were painted in red. The acquittee thought that everyone was against him. Eventually, the acquittee removed the container from his mouth and gave it to Nobile. Nobile and Dillon agreed that the acquittee should be committed temporarily for a psychiatric evaluation.

The acquittee was admitted to the Connecticut Mental Health Center (mental health center), where he pulled out one of his front teeth rather than request dental treatment. He continued to use cocaine, having asked a friend to bring the drug to him. At trial, the acquittee testified that as a consequence of taking the medicine prescribed for him at the mental health center, he was feeling better. LeBlanc also noticed that after he began to take the medicine, the acquittee was calmer and better able to sleep.

The acquittee was discharged from the mental health center in December, 2000, and entered treatment with Peter Moher, a psychiatrist. Moher diagnosed the acquittee as suffering from bipolar I disorder with psychotic features (bipolar disorder), which is one of the more severe forms of mental illness. It is a persistent illness that manifests itself with mood swings, unclear thinking, and, in its severe form, delusions, grandiosity and irrational behavior. Symptoms of bipolar disorder generally begin to occur when the individual is in his teens or early twenties and progress in severity until they come to the attention of the medical community or law enforcement. If left untreated, bipolar disorder worsens to the point of death. Thirty percent of persons with the disorder commit suicide. They also take risks that are often fatal.

The first time Moher met with the acquittee, he was exhibiting symptoms of bipolar disorder because he had run out of his medicine. He behaved in a grandiose manner and was preoccupied with death. The acquittee told Moher that his suicide attempt was an effort to improve the legal system in the United States. In the process of killing himself, the acquittee reasoned, he would send a message to the country to improve communication between acquittees and prosecutors. Moher prescribed two types of medicine for the acquittee: one to modulate the intensity and frequency of his mood swings and the other to lessen his racing thoughts, delusional thinking and disorganized behavior. Most important to Moher's diagnosis was the fact that the acquittee got better when he took his medicine.

In reaching his diagnosis, Moher relied on reports from the mental health center. A psychiatric history is important to the diagnosis because bipolar disorder does not come on suddenly, but develops over the course of years. The acquittee's history was consistent with the illness, a disease of the brain. The acquittee had needed psychiatric treatment at the age of thirteen. He was involved in physical altercations and substance abuse, which often are part of the disorder. More than 60 percent of people with the illness are substance abusers. In June, 2000, the acquittee was ingesting a gram of cocaine and two quarts of liquor a day. Although those substances do not cause bipolar disorder, individuals suffering from bipolar disorder attempt to manage their moods with drugs or alcohol. The mood of a person with bipolar disorder swings from deep depression to florid mania. One's decision-making ability depends on where one is in the cycle. A person suffering

to consider the mental health commissioner's report (Whiting report). In addition, Peter M. Zeman, a psychiatrist, testified on behalf of the acquittee pursuant to an examination conducted by the Institute of Living Medical Group, P.C. Zeman reviewed the acquittee's records and interviewed him. Zeman testified that at the time he saw the acquittee in June, 2002, the acquittee's mental state showed no evidence of psychotic illness, disorders of perception or confusion or delusional thinking. His thinking was organized and goal directed, and his mood was relatively stable. At the time, the acquittee was not taking any medicine. Zeman concluded that the acquittee had been misdiagnosed as having bipolar I disorder with psychotic features, and that the acquittee did not have a bipolar disorder and never had suffered from such disorder. According to Zeman, the acquittee's behavior in June, 2000,[4] had been caused by his excessive use of cocaine and alcohol. During the acquittee's second hospitalization at Whiting, he did not take medicine. The absence of medicine supported Zeman's conclusion.

Zeman diagnosed the acquittee as having alcohol and cocaine dependence, in remission, in a controlled environment. Zeman also diagnosed the acquittee as having an antisocial personality disorder, which is a psychiatric disorder.[5] Individuals, such as the acquittee, who suffer from personality disorders do not have a propensity to be violent, although a subclass of people with personality disorders can be dangerous and violent. Zeman opined that the acquittee met the criteria for a person committed to the custody of the board: his illness was

from bipolar disorder has difficulty maintaining a sequence of time and dates. The disease also causes its victims to act impulsively and to spend a lot of money on things they do not need. The acquittee had a history of such behavior.

[4] See footnote 3.

[5] The basis of Zeman's diagnoses is the nomenclature and criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) published by the American Psychiatric Association.

stabilized; he no longer exhibited a propensity to be violent; he had insight and understanding of his illness and the need for treatment; and he cooperated in his own treatment plan. According to Zeman, the acquittee minimizes how difficult it would be for him to remain alcohol and drug free outside a controlled environment. Zeman opined, however, that the acquittee was not in need of maximum security confinement and should be transferred from Whiting to the Dutcher Enhanced Security Service of Connecticut Valley Hospital (Dutcher).

The state called Alexander Carre, a psychiatrist at Whiting, to testify with respect to the Whiting report, which was prepared by an evaluation team in March, 2002.[6] In summary, the team diagnosed the acquittee as having cocaine dependence in remission in a controlled environment, alcohol dependence in remission in a controlled environment, other substance induced mood disorders (alcohol and cocaine) and an antisocial personality disorder. Consistent with his personality disorder, the acquittee lacked empathy for others and was quite self-centered. His propensity to be dangerous was predicated on his relentless use of alcohol and cocaine. The team that evaluated and continued to treat the acquittee concluded that he had no significant psychiatric disorder. According to Carre, the acquittee had cognitive distortions. Prior to the time the Whiting report was submitted, the acquittee had been an exemplary patient at Whiting. Subsequent to the submission of the Whiting report, the acquittee, however, engaged in one-upmanship with his treatment team. He had overvalued senses of competence and power to control. He often intervened in the treatment of other patients, reluctantly participated in his own therapy and tried to

---

[6] The basis of the Carre diagnosis is also the nomenclature and criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) published by the American Psychiatric Association.

manipulate his treatment by means of the grievance process. According to Carre, the acquittee required the structure provided by a maximum security placement to diminish the impact he had on the therapeutic milieu. Zeman had diagnosed the acquittee with an antisocial personality disorder, characterized by bed wetting, fire setting, cruelty to animals and truancy. These behaviors exhibit themselves during early human development. The Whiting report diagnosed the acquittee as having adult antisocial personality disorder, which is characterized by a person's making bad choices on the basis of cognitive distortions. Carre did not have enough information about the acquittee's upbringing to reach Zeman's conclusion that the acquittee suffered from an antisocial personality disorder. Regardless of the numerical diagnosis from the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders; see footnotes 5 and 6; a person suffering from a personality disorder will commit the same crimes and engage in the same kind of poorly thought out and impulsive behaviors.

After the Whiting report was completed, Carre continued to observe the acquittee. In a June, 2002 progress note, Carre wrote that the acquittee would benefit from rehabilitation far more than from treatment at Whiting. When the acquittee was at Whiting, away from alcohol and cocaine, he exhibited no violent or threatening behavior. Carre, however, concluded that the acquittee was not able to control his consumption of cocaine and alcohol. He was prone to violence when he ingested these drugs and presented a danger to himself and society to the extent that he was unable to control his consumption of cocaine and alcohol.[7]

At the conclusion of the hearing, the court found that the acquittee had "a mental condition characterized

---

[7] Neither Zeman nor the Carre report found that the acquittee suffers from bipolar I disorder with psychosis.

by alcohol dependence, in remission in a controlled environment; cocaine dependence, in remission in a controlled environment; other substance induced mood disorder, cocaine and alcohol; adult antisocial personality disorder; and problems related to interaction with the legal system and crime." The court also found that the acquittee remained a danger to himself and the community and had to be confined. Although there was insufficient evidence for it to find that the acquittee was so violent as to require commitment under conditions of maximum security, the court found that the acquittee's potential for violence existed, that he needed a highly structured environment and that such a therapeutic milieu would be in his best interest. The court ordered the acquittee committed to the jurisdiction of the board in a maximum security setting, i.e., Whiting, pending a hearing before the board pursuant to General Statutes § 17a-583. The effective term of the acquittee's commitment is thirty-five years. The acquittee has appealed pursuant to § 17a-582 (g).[8]

I

We will address first the acquittee's claim that the court denied him due process of law by failing to apply the civil commitment standard regarding mental illness and psychiatric disability when it committed him to the jurisdiction of the board pursuant to General Statutes § 17a-580 (10).[9] The acquittee bases his claim on the fact that the court found him to have "a mental condition characterized by alcohol dependence, in remission in

---

[8] Subsequently, the acquittee filed a motion for articulation pursuant to Practice Book § 66-5. The court denied the motion for articulation, citing in part *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986).

[9] General Statutes § 17a-580 provides in relevant part: "(10) 'Person who should be confined' means an acquittee who has psychiatric disabilities or is mentally retarded to the extent that his discharge or conditional release would constitute a danger to himself or others and who cannot be adequately controlled with available supervision and treatment on conditional release . . . ."

a controlled environment; cocaine dependence, in remission in a controlled environment; [and] other substance induced mood disorder, cocaine and alcohol," among other things. The acquittee argues that the court's findings are not psychiatric disabilities or mental illness because General Statutes § 17a-495 (a) and (c),[10] definitions found in the statutory scheme for civil commitments, apply and specifically exclude alcohol dependent and drug-dependent persons as individuals who have a mental or emotional condition. We are not persuaded.

Although the issue in *State* v. *March*, 265 Conn. 697, 830 A.2d 212 (2003), concerned the release of an acquittee in the custody of the board pursuant to General Statutes § 17a-593 (a), the parties agree, and we concur, that our Supreme Court's reasoning in *March* applies to the issue in this appeal, concerning an initial commitment to the board. First, we note that the meaning of "psychiatric disabilities" under § 17a-580 (10) is a question of statutory interpretation over which our review is plenary. *State* v. *March*, supra, 705.

---

[10] General Statutes § 17a-495 provides in relevant part: "(a) For the purposes of sections 17a-75 to 17a-83, inclusive, and 17a-615 to 17a-618, inclusive, the following terms shall have the following meanings . . . 'mentally ill person' means any person who has a mental or emotional condition which has substantial adverse effects on his or her ability to function and who requires care and treatment, and *specifically excludes a person who is an alcohol-dependent person or a drug-dependent person*, as defined in section 17a-680 . . . .

"(c) For the purposes of sections 17a-495 to 17a-528, inclusive, 'person with psychiatric disabilities' means any person who has a mental or emotional condition which has substantial adverse effects on his or her ability to function and who requires care and treatment, and specifically excludes a person who is an alcohol-dependent person or a drug-dependent person, as defined in section 17a-680." (Emphasis added.)

The rules of statutory construction require that we apply the plain meaning of the statute. See General Statutes § 1-2z. In applying § 1-2z to § 17a-495 (a) and (c), the inevitable conclusion is that that statute does not encompass General Statutes §§ 17a-580 through 17a-603, which pertain to the board. See *State* v. *March*, 265 Conn. 697, 706–707, 830 A.2d 212 (2003).

As in *March*, the "statutes relevant to this appeal, General Statutes §§ 17a-580 to 17a-603, are contained in part V of chapter 319i [of our General Statutes], which is entitled 'Psychiatric Security Review Board.' General Statutes § 17a-581 (j) authorizes the board to adopt regulations necessary to carry out the purposes of chapter 319i. Section 17a-581-1 of the Regulations of Connecticut State Agencies provides: 'These rules and regulations will govern practice and procedures before the [board] as authorized by Sections 17a-580 through 17a-602 of the General Statutes.' Section 17a-581-2 (a) [10] of the Regulations of Connecticut State Agencies corresponds to § 17a-580 [10] of the General Statutes." *State* v. *March*, supra, 265 Conn. 706. Section 17a-580 (10) defines a person who should be confined to the board pursuant to § 17a-582 as "an acquittee who has psychiatric disabilities . . . to the extent that his discharge or conditional release would constitute a danger to himself or others and who cannot be adequately controlled with available supervision and treatment on conditional release . . . ." General Statutes § 17a-580 (10). Section 17a-581-2 (a) (10) of the Regulations of Connecticut State Agencies provides in relevant part that a " '[p]erson who should be confined' means an acquittee who is mentally ill . . . to the extent that his discharge or release from the hospital on a conditional release would constitute a danger to himself or others, and who cannot be controlled adequately with available supervision and treatment on conditional release." Subsection (a) (5) of the same regulation defines "mental illness" as "any mental illness or mental disease as defined by the current Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association and as may hereafter be amended. . . ." Regs., Conn. State Agencies § 17a-581-2 (a) (5).

"Thus, it is apparent that the meaning of 'psychiatric disability' as used in part V of chapter 319i is governed by the statutes contained therein and the regulations

promulgated pursuant to those statutes. The definitions found in [General Statutes] § 17a-458 (a) do not apply to part V of chapter 319i because that statute specifically enumerates the sections to which it applies and does not refer to any of the sections in part V." *State* v. *March,* supra, 265 Conn. 708.

Furthermore, our Supreme Court "previously has acknowledged that criminal acquittees have a special status that differs from the status of those committed through the civil commitment process (civil committees). In *State* v. *Metz,* 230 Conn. 400, 416–17, 645 A.2d 965 (1994), [our Supreme Court] stated that our statutes distinguish between those who are civilly committed and those who are insanity [criminal] acquittees. [Our Supreme Court has] upheld the validity of such disparities in a number of cases. *State* v. *Miller,* 192 Conn. 532, 538, 472 A.2d 1272 (1984); *State* v. *Reed,* 192 Conn. 520, 529, 532, 473 A.2d 775 (1984). The use of a less demanding measure of the quantum of evidence for the initial confinement of [criminal] acquittees than that afforded civil committees . . . has been constitutionally justified because of the unique status of persons acquitted by reason of insanity. *State* v. *Miller,* supra, 538; *Warren* v. *Harvey,* 632 F.2d 925, 931 (2d Cir. 1980); *State* v. *Warren,* 169 Conn. 207, 215, 363 A.2d 91 (1975). [Our Supreme Court has] acknowledged that [t]he obvious difference between insanity [criminal] acquittees and other persons facing commitment is the fact that the former have been found, beyond a reasonable doubt, to have committed a criminal act. *Warren* v. *Harvey,* supra, 931; *State* v. *Warren,* supra, 215." (Internal quotation marks omitted.) *State* v. *March,* supra, 265 Conn. 717–18 (*Vertefeuille, J.,* concurring).[11]

---

[11] For an examination of the legislative history concerning the standards for the commitment of acquittees to the board; General Statutes §§ 17a-580 through 17a-603; see Justice Vertefeuille's concurrence in *State* v. *March,* supra, 265 Conn. 718–22.

In the case before us, the court found that the acquittee suffered from a mental condition defined by the current edition of the Diagnostic and Statistical Manual of Mental Disorders in accord with the testimony of both Zeman and Carre. See footnotes 4 and 5. We thus conclude that the court did not apply an improper standard.

## II

The acquittee's second claim is that the court committed plain error and deprived him of the right to due process of law by concluding that he has a mental condition that requires confinement under conditions of maximum security without first determining that he suffers from a psychiatric disability to the extent that his discharge or conditional release would present a danger to himself and others in contravention of §§ 17a-582[12] and 17a-580 (10). We disagree.

The acquittee failed to preserve this claim for appellate review and seeks plain error review pursuant to Practice Book § 60-5. "Plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *West-*

---

[12] General Statutes § 17a-582 provides in relevant part: "(a) When any person charged with an offense is found not guilty by reason of mental disease or defect pursuant to section 53a-13, the court shall order such acquittee committed to the custody of the Commissioner of Mental Health and Addiction Services who shall cause such acquittee to be confined, pending an order of the court pursuant to subsection (e) of this section . . . .

"(e) At the hearing, the court shall make a finding as to the mental condition of the acquittee and, considering that its primary concern is the protection of society, make one of the following orders:

"(1) If the court finds that the acquittee is *a person who should be confined* or conditionally released, the court shall order the acquittee committed to the jurisdiction of the board and . . . confined in a hospital for psychiatric disabilities . . . for custody, care and treatment pending a hearing before the board pursuant to section 17a-583 . . . ." (Emphasis added.)

*port Taxi Service, Inc.* v. *Westport Transit District,* 235 Conn. 1, 25, 664 A.2d 719 (1995). "A trial court commits plain error when it fails to apply a clearly relevant statute to the case before it." (Internal quotation marks omitted.) *State* v. *Guckian,* 27 Conn. App. 225, 246, 605 A.2d 874 (1992), aff'd, 226 Conn. 191, 627 A.2d 407 (1993).

The essence of the acquittee's claim is that the court committed him to the custody of the board pursuant to a dangerousness standard, not a mental illness standard. The record clearly is to the contrary. Furthermore, the claim is predicated, in part, on the acquittee's first claim that the statutes governing a civil commitment control an acquittee's commitment to the board. In part I, we concluded, in keeping with *State* v. *March,* supra, 265 Conn. 697, that commitment to the board is governed by §§ 17a-580 through 17a-603 and that a person who should be confined is an acquittee with a psychiatric disability or who is mentally ill as defined by the Diagnostic and Statistical Manual of Mental Disorders. Part of the acquittee's argument is that the court used the term "mental condition" rather than "psychiatric disability" or "mental illness" when making its findings that he should be committed to the board.

With the foregoing in mind, our review of the court's oral decision discloses that the court found that the acquittee "has a mental condition characterized by alcohol dependence, in remission in a controlled environment; cocaine dependence, in remission in a controlled environment; other substance induced mood disorder cocaine and alcohol; adult antisocial personality disorder; and problems related to interaction with the legal system and crime." We first note that § 17a-582 (e) provides in relevant part: "At the hearing [on the report of the commissioner of mental health], the court shall make a finding as to the *mental condition* of the acquittee . . . ." (Emphasis added.) The required find-

ing is plain and unambiguous. In this instance, the court found, consistent with the diagnoses in both the Whiting report and Zeman's testimony, that the acquittee suffers from a number of mental conditions that are psychiatric disabilities or mental illnesses as defined by the Diagnostic and Statistical Manual of Mental Disorders. For these reasons, we cannot agree with the acquittee's claim that the court failed to apply a legal standard of psychiatric disability.

We also disagree with the acquittee's claim that the court did not find that he had a psychiatric disability to the extent that, if discharged, he would constitute a danger to himself or others. See General Statutes § 17a-580 (10). Although the court did not cite *State* v. *Putnoki*, 200 Conn. 208, 221, 510 A.2d 1329 (1986), in its oral decision,[13] it carefully set forth the *Putnoki* factors as those it considered in reaching its decision. "In reaching its difficult decision, the court may and should consider the entire record available to it, including the defendant's history of mental illness, his present and past diagnoses, his past violent behavior, the nature of the offense for which he was prosecuted, the need for continued medication and therapy, and the prospects for supervision if released." Id. The court also noted that its primary concern is the protection of society. See General Statutes § 17a-582 (e). The court reviewed the entire record and concluded that the acquittee remained a danger both to himself and the community and had to be confined.

On the basis of our review of the entire record, we cannot conclude that the court's finding that the acquittee should be committed to the board was clearly erroneous. See *State* v. *Warren*, 77 Conn. App. 564, 568, 824 A.2d 849 (whether acquittee is currently mentally

---

[13] The court, however, cited *State* v. *Putnoki*, supra, 200 Conn. 221, in its memorandum of decision denying the acquittee's motion for articulation.

ill to extent he would pose danger to himself or community if discharged is question of fact governed by clearly erroneous standard of review), cert. denied, 265 Conn. 907, 831 A.2d 253 (2003). Both of the experts who testified at the hearing concluded that the acquittee is alcohol and cocaine dependent, in remission, and that his abstinence is dependent on his being in a controlled environment. The court also heard expert testimony that the acquittee's excessive consumption of these substances was conducive to the violence that led to the underlying prosecution. Furthermore, the acquittee suffers from an antisocial personality disorder characterized by the inability to conform one's behavior to social norms and the law.

"Section 17a-581-2 (a) (6) of the Regulations of Connecticut State Agencies defines [d]anger to self or to others, as used in General Statutes § 17a-580 (5), as the risk of imminent physical injury to others or self, including the risk of loss or destruction of the property of others." (Internal quotation marks omitted.) *State* v. *March*, supra, 265 Conn. 709. The evidence presented at the acquittee's criminal trial revealed that he had purchased explosives, which he stored in his home where children were present, obtained firearms that he used to threaten people, abused alcohol and cocaine, and threatened suicide. See footnote 3. We therefore conclude that the court's committing the acquittee to the custody of the board was in accordance with part V of chapter 319i of our General Statutes, was not plain error and in no way served to undermine society's confidence in the judicial proceedings.

### III

The acquittee's third claim is that the court improperly committed him to the board under conditions of maximum security in violation of General Statutes § 17a-599. The state disagrees with the acquittee's claim,

but also argues that we lack subject matter jurisdiction to consider the claim because it is moot. Although the court's oral decision appears to be at odds with § 17a-599,[14] the acquittee's claim is moot, as there is no relief that we can provide, and his claim does not come within any of the exceptions to the mootness doctrine.

The following facts are relevant to the state's mootness claim. The court ordered the acquittee committed to the jurisdiction of the board under maximum security conditions in September, 2002. Subsequent to the acquittee's filing this appeal, Whiting personnel submitted to the board an application that the acquittee be transferred to the less restrictive Dutcher facility. The board held a hearing on the application on November 14, 2003, and May 7, 2004. On May 21, 2004, the board

---

[14] In ordering the acquittee confined to the custody of the board, the court stated: "Further, although *this court finds that there is insufficient evidence to find that the [acquittee] is so, and I emphasize so violent as to require a commitment under conditions of maximum security,* the court nevertheless finds that the potential for violence exists, and the [acquittee] needs a highly structured environment and that that environment, therapeutic milieu, would be in the [acquittee's] best interest. Therefore, this court orders the [acquittee] committed to the jurisdiction of the psychiatric review board at the maximum setting of the Whiting Forensic Division of Connecticut Valley Hospital pending a hearing before the board under § 17a-583 of the . . . General Statutes."

General Statutes § 17a-599 provides in relevant part: "At any time the court . . . determines that the acquittee is a person who should be confined, it *shall make a further determination of whether the acquittee is so violent as to require confinement under conditions of maximum security.* Any acquittee found so violent as to require confinement under conditions of maximum security shall not be confined in any hospital for psychiatric disabilities . . . unless such hospital . . . has the trained and equipped staff, facilities or security to accommodate such acquittee." (Emphasis added.)

Section 17a-599 requires that the court make a finding as to whether the acquittee is so violent as to require confinement under conditions of maximum security. In addressing its findings with respect to § 17a-599, the court stated that there was insufficient evidence that the acquittee was so violent as to require maximum security commitment. Furthermore, § 17a-599 makes no mention of the acquittee's best interest. See General Statutes § 1-2z.

granted the application, and the acquittee was transferred to Dutcher.

"Mootness implicates the subject matter jurisdiction of this court. . . . We will not decide questions where there exists no actual controversy or where no actual or practical relief can follow from our determination. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . Moreover, [w]hen, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citations omitted; internal quotation marks omitted.) *Peart* v. *Psychiatric Security Review Board*, 41 Conn. App. 688, 691, 678 A.2d 488 (1996).[15]

The state contends that the acquittee's claim is not reviewable pursuant to either of the exceptions to the mootness doctrine. We agree that the claim fails under the first prong of the capable of repetition, yet evading review exception articulated in *Loisel* v. *Rowe*, 233 Conn. 370, 382, 660 A.2d 323 (1995), for the reasons set forth in *Peart*. See *Peart* v. *Psychiatric Security Review Board*, supra, 41 Conn. App. 693 (not likely that substantial majority of cases will proceed along this procedural path). The claim also fails because there are no collateral legal consequences to the acquittee. See *Sibron* v. *New York*, 392 U.S. 40, 53–55, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). As in *Peart*, in which this court concluded that the findings made by the trial court did not

---

[15] This court dismissed the plaintiff's appeal in *Peart* v. *Psychiatric Security Review Board*, supra, 41 Conn. App. 694, because, at the time the appeal was heard, the board had transferred the plaintiff to a less restrictive environment. The plaintiff had appealed from an earlier decision of the board denying his application for transfer. *Peart* is distinguishable from the present appeal because it concerns the action of the board taken pursuant to General Statutes § 17a-585. The statute at issue here is General Statutes § 17a-599, which concerns the judgment of the court, which is appealable pursuant to General Statutes § 17a-582 (g).

adversely affect the plaintiff, the weight of the court's findings here are greatly dissipated by the board's evaluation and determination that the acquittee no longer requires maximum security confinement. See *Peart* v. *Psychiatric Security Review Board*, supra, 692.

The judgment is affirmed.

In this opinion the other judges concurred.