******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* STEPHEN GUILD
## (SC 21023)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

### *Syllabus*

The acquittee, who had been found not guilty of certain crimes by reason of mental disease or defect, was committed to the jurisdiction of the Psychiatric Security Review Board in 1999, for a period not to exceed twenty years. The acquittee's commitment was extended multiple times since the expiration of his initial term of commitment. In 2022, the state filed a petition to extend the acquittee's commitment pursuant to statute (§ 17a-593 (c)). The acquittee moved to dismiss the state's 2022 petition on the ground that the commitment procedure set forth in § 17a-593 (c) violated his right to equal protection under the United States constitution, but the trial court denied the acquittee's motion to dismiss and, in 2023, granted the state's petition, extending the acquittee's commitment for two more years, until 2025. The acquittee then appealed from the trial court's 2023 order extending his commitment until 2025. In 2024, prior to oral argument before this court, the state filed another petition with the trial court, which, if granted, would have extended the acquittee's commitment beyond 2025. In response to that petition, the board filed a report recommending that the trial court deny the state's 2024 petition because the acquittee was no longer a danger to himself or others. The state ultimately withdrew its 2024 petition, which resulted in the acquittee's discharge from the jurisdiction of the board while this appeal was pending, in March, 2025. *Held*:

Because the acquittee was discharged from the custody of the board during the pendency of this appeal, the appeal was rendered moot.

Contrary to the acquittee's claim, the collateral consequences doctrine did not save the acquittee's appeal from being dismissed as moot, as the 2023 commitment order constituted an extension of several, prior commitments beyond the acquittee's initial twenty year term that all stemmed from one acquittal, and this court did not see how the 2023 order materially increased the stigma associated with his commitment or gave rise to a reasonable possibility that it would cause him to suffer adverse collateral consequences in the future.

Moreover, the acquittee could not prevail on his claim that this court should not dismiss the appeal because it presented issues that were capable of repetition, yet evading review, as there was no strong likelihood that a substantial majority of cases challenging an extension of commitment would become moot before appellate litigation could be concluded.

Nevertheless, because the acquittee was precluded from fully litigating the correctness of the 2023 commitment order through no fault of his own, insofar as such a challenge was rendered moot by virtue of the state's withdrawal of its 2024 petition to extend his commitment, this court vacated the trial court's 2023 order to avoid the possibility of any lingering or remote consequences from that order.

Argued December 4, 2024—officially released August 19, 2025

*Procedural History*

Petition for an order extending the acquittee's commitment to the Psychiatric Security Review Board, brought to the Superior Court in the judicial district of Middlesex, where the court, *Oliver, J.*, denied the acquittee's motion to dismiss the petition; thereafter, the case was tried to the court, *Oliver, J.*, which issued an order granting the petition, from which the acquittee appealed. *Appeal dismissed*; *order vacated.*

*Kevin Semataska*, assistant public defender, with whom was *James B. Streeto*, senior assistant public defender, for the appellant (acquittee).

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, was *Michael A. Gailor*, state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. This appeal requires us to consider whether the release of an insanity acquittee[1] from the custody of the Psychiatric Security Review Board (board) moots his pending appeal challenging the trial court's order extending his commitment to the board that was issued on July 11, 2023 (2023 commitment order). In this appeal, the acquittee, Stephen Guild, has raised several factual and constitutional challenges to his continued commitment under General Statutes

---

[1] "An insanity acquittee is any person found not guilty by reason of mental disease or defect . . . ." (Internal quotation marks omitted.) *State* v. *Dyous*, 307 Conn. 299, 301 n.1, 53 A.3d 153 (2012); see also General Statutes § 17a-580 (1).

§ 17a-593 (c). While this appeal[2] was pending, on December 2, 2024, the state filed a new petition that would have extended the acquittee's commitment to the custody of the board beyond the acquittee's discharge date of March 20, 2025 (2024 petition). After conducting a hearing on the 2024 petition pursuant to § 17a-593 (d), the board filed a report dated January 22, 2025, in which it found that the acquittee was no longer a danger to himself or others as to require supervision by the board and recommended that the trial court deny the state's petition for further commitment. The state did not challenge the board's finding, and it withdrew the 2024 petition, which resulted in the acquittee's discharge from the custody of the board on March 20, 2025.

These events, which occurred during the pendency of this appeal, have rendered this appeal moot. Put simply, given that the acquittee has been released from the custody of the board on March 20, 2025, we cannot grant him any practical relief from the 2023 commitment order. Further, the acquittee has not established that there are any legally cognizable collateral consequences resulting from the 2023 commitment order, or that this is a matter that is capable of repetition, yet evading review. The acquittee was, however, precluded from fully litigating the correctness of the 2023 commitment order through no fault of his own, insofar as it was rendered moot when the state withdrew the 2024 petition. Accordingly, we dismiss the appeal but vacate the 2023 commitment order.

The record reveals the following relevant facts and procedural history. In October, 1997, the acquittee stabbed and slashed his father multiple times, causing him to suffer critical injuries. The state charged the

---

[2] The acquittee appealed from the 2023 commitment order to the Appellate Court, and we granted his motion to transfer the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

acquittee with numerous offenses, including attempted murder and assault in the first degree. The acquittee, who had previously been diagnosed with schizophrenia and an alcohol use disorder, raised the defense that he was not guilty by reason of mental disease or defect (insanity). The trial court rendered a judgment acquitting him of those charged index offenses[3] by reason of insanity. On March 5, 1999, the court committed the acquittee to the custody of the board for a period not to exceed twenty years. See General Statutes § 17a-582 (e) (1) (A) (maximum commitment period is maximum sentence of index offense). The board ordered that the acquittee be confined in what was then the Whiting Forensic Division (Whiting) of the Connecticut Valley Hospital (hospital), which was the board's maximum security facility. Since the expiration of the acquittee's initial term of commitment in March, 2019, the trial court has extended the acquittee's commitment several times, either by the agreement of the parties during the pendency of litigation, or by finding, after conducting evidentiary hearings, that there was clear and convincing evidence that the acquittee remained "a person with psychiatric disabilities . . . to the extent that his discharge . . . would constitute a danger to himself or others . . . ."[4] General Statutes § 17a-593 (c).

---

[3] "[T]he psychiatric profession refers to the offenses that led to an acquittee's arrest as index offenses." (Internal quotation marks omitted.) *State* v. *Foster*, 353 Conn. 1, 6 n.5,    A.3d    (2025).

[4] Specifically, the state first filed a petition for continued commitment in November, 2018, which was prior to the expiration of the initial term of commitment in March, 2019. The board filed a report pursuant to § 17a-593 (d), recommending that the trial court grant the petition and extend the commitment for no more than three years. The acquittee subsequently moved to dismiss that petition on the ground that § 17a-593, as applied to him, violated his right to equal protection under the United States constitution. The trial court, *Keegan, J.*, denied that motion to dismiss. The acquittee then filed an interlocutory appeal from the denial of the motion to dismiss, which the Appellate Court dismissed for lack of a final judgment in 2022. See *State* v. *Guild*, 214 Conn. App. 121, 122–23, 132, 279 A.3d 222 (2022).

While that appeal was pending, the state filed a revised petition for continued commitment, and the board filed a report recommending the continued

The acquittee was confined under maximum security conditions at Whiting from 1999 until 2010. Following some struggles in the early years of his commitment with inconsistent engagement with therapy and his medicinal regimen, which caused his psychosis and para noia to remain actively symptomatic, the acquittee's condition improved. In December, 2010, the board granted the hospital's application to transfer the acquittee from Whiting to its less restrictive inpatient placement, Dutcher Enhanced Security Service (Dutcher).

The acquittee received more freedom in the years following his transfer to Dutcher. His privileges began with staff supervised community outings and permission to move unescorted around hospital grounds. After holding a hearing in October, 2013, the board granted the acquittee temporary leave from Dutcher to participate in day treatment services at the Rushford Center (Rushford) in Meriden, which is a community-based and staff supervised treatment facility. Finally, the acquittee progressed to overnights in the community, with support and supervision from Rushford, in 2015. Following a hearing in June, 2016, the board granted the acquittee conditional release from the hospital to the Meriden

commitment of the acquittee because there was clear and convincing evidence that the acquittee remained a person with psychiatric disabilities and that his release would constitute a danger to himself or others.

During the pendency of the proceedings concerning the appeal from the denial of the initial motion to dismiss, and with the agreement of the parties regarding the acquittee's best interests, the trial court ordered various extensions of the acquittee's commitment without prejudice, but acknowledged the importance of public safety, ranging from several weeks to one year, on February 22, 2019, May 10, 2019, June 20, 2019, June 10, 2020, September 10, 2020, and November 17, 2020. On September 28, 2021, the trial court granted a joint motion by the state and the acquittee for a continuation of his commitment by agreement for a period not to exceed March 20, 2023. In October, 2022, the state filed the petition for continued commitment that resulted in the 2023 commitment order that is the subject of this appeal. In its 2023 commitment order, the trial court granted the state's petition, extending the acquittee's commitment for a period of two years, to March 20, 2025.

area, and he was discharged from the hospital to the supervision of Rushford in September, 2016. See General Statutes §§ 17a-588 and 17a-589.

Compliant with his medicinal and treatment regimen under Rushford's supervision, the acquittee progressed well while living in the community. He eventually obtained gainful employment at a warehouse. As a result of his progress, the board modified several of his conditions of release to grant him additional privileges and independence, including permission to operate a motor vehicle.

In 2020, the acquittee had a setback when he began to experience increased anxiety that was attributable to social isolation during the COVID-19 pandemic. By October, 2020, the acquittee had expressed numerous paranoid and delusional beliefs to his conditional release supervisors and had also violated several of his conditions of release. Although the acquittee did not act violently during his delusional episodes, his treatment team, in consultation with Jessica Matyka, the acquittee's conditional release supervisor, determined that "his risk had escalated" and that he should be hospitalized for increased supervision and observation. Following that assessment by his treatment team, the acquittee was voluntarily readmitted to Whiting on October 22, 2020. He remained at Whiting for approximately eight months, until June, 2021.

In June, 2021, the acquittee returned to the community on conditional release. Since that time, he has lived independently in a leased apartment in Meriden. He has remained compliant with his medicinal regimen and has continued to participate in therapy. The acquittee has also developed coping strategies, including participating in various social groups and attending Alcoholics Anonymous meetings. His moods have been stable, and he has not had any reported increases in paranoia, rigid-

ity, or irritability. He is still gainfully employed at a warehouse and participates in a variety of social activities, both at Rushford and in the community. On the basis of the acquittee's progress, the board granted the acquittee additional modifications to his conditions of release. Those modifications included decreasing the frequency of testing for drugs and other substances, reducing curfew checks, and granting the acquittee permission to operate a motor vehicle within a twenty mile radius for limited purposes, such as for visiting family, playing golf, shopping, and traveling to and from his place of employment and treatment locations. In 2022, the board also granted the acquittee permission to suspend his mandatory health and wellness group visits, so that he could attend his own social activities instead.

In October, 2022, the state filed the petition for continued commitment that is the subject of this appeal. See General Statutes § 17a-593 (c) (state must file petition to extend commitment at least 135 days before commitment expiration date). The board subsequently filed a report with the trial court pursuant to § 17a-593 (d), recommending that the court grant the petition for a period not to exceed two years.

The acquittee moved to dismiss the petition, claiming that § 17a-593, as applied to him, violated his right to equal protection under the United States constitution because his continued commitment under that statute imposes a greater burden on his liberty than those procedures applicable to civilly committed inmates. The trial court, *Oliver, J.*, denied the acquittee's motion to dismiss, concluding that it was bound by the Appellate Court's rejection of a similar equal protection challenge in the companion case to this appeal. See *State* v. *Foster*, 217 Conn. App. 476, 506, 289 A.3d 191 (2023), aff'd, 353 Conn. 1,      A.3d      (2025).

Following an evidentiary hearing, on July 11, 2023, the trial court granted the state's petition for continued

commitment and issued the 2023 commitment order. In the 2023 commitment order, the court found that the state had met its burden of proving by clear and convincing evidence that the acquittee's release from the board's jurisdiction would constitute a danger to himself or others. See General Statutes § 17a-593 (c) and (g); see also, e.g., *State* v. *Metz*, 230 Conn. 400, 425, 645 A.2d 965 (1994). The court relied primarily on the recurrence of the acquittee's delusions that necessitated his hospitalization in 2020. The court also acknowledged that the acquittee's "delusional and paranoid thinking can be controlled with medications" but expressed concern about the likelihood of a violent response to a perceived threat in the event that the acquittee stopped taking his medication. The court explained that, because the acquittee "has not lived unsupervised since 1997 . . . it is unknown if he would continue to abide by his medical and therapeutic regimen without supervision." Emphasizing that its "primary consideration" under the statutory scheme "is the protection of society" and that its "secondary concern is the safety and well-being of the acquittee"; General Statutes § 17a-593 (g); the trial court found that "the state ha[d] carried its burden by clear and convincing evidence." Accordingly, the trial court extended the acquittee's commitment for two more years, to March 20, 2025. This appeal from the 2023 commitment order followed.

Oral argument was held before this court on December 4, 2024. First, the acquittee claimed that clear and convincing evidence did not support the trial court's finding of dangerousness under § 17a-593 (g). Second, the acquittee argued that the trial court violated his equal protection rights under article first, § 20, of the Connecticut constitution and the fourteenth amendment to the United States constitution by following the standard set forth in § 17a-593 (g), which identifies the protection of the public as its primary consideration,

rather than the civil commitment standard in General Statutes § 17a-498 (c) (3), which focuses on whether the acquittee is a danger to himself or others and requires the court to order the least restrictive placement available.

On December 2, 2024, two days prior to oral argument before this court, the state filed the 2024 petition with the trial court, which, if granted, would have extended the acquittee's commitment to the custody of the board beyond March 20, 2025. In response to the 2024 petition, on January 23, 2025, the board filed a report pursuant to § 17a-593 (d), recommending that the trial court deny the state's petition for continued commitment because the acquittee was no longer a danger to himself or others.

On March 11, 2025, the state withdrew the 2024 petition, advising the trial court of its view that the acquittee was no longer a danger to himself or others. Specifically, in its letter withdrawing the 2024 petition, the state relied on the board's findings that the acquittee had (1) "remained clinically stable and adherent to the conditions of his release," (2) "remained engaged in therapy and all aspects of treatment while working in the community, and . . . maintained his sobriety," and (3) "maintain[ed] a stable living environment, [was] gainfully employed, [and] independently administer[ed] his own medication . . . ." As a result of the state's withdrawal, the acquittee was discharged from the custody of the board on March 20, 2025. After counsel informed us that the state had withdrawn the 2024 petition, we ordered the parties to file simultaneous supplemental briefs addressing the following question: "Will the discharge of the acquittee from the custody of the board on March 20, 2025, following the expiration of his term of commitment on that date, render moot his appeal challenging that commitment?"

"[M]ootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve before we may reach the merits of an appeal. . . . It is well settled that an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Citation omitted; internal quotation marks omitted.) *7 Germantown Road, LLC* v. *Danbury*, 351 Conn. 169, 176, 329 A.3d 927 (2025). "In determining mootness, the dispositive question is whether a successful appeal would benefit the [parties] in any way." (Internal quotation marks omitted.) *Wendy V.* v. *Santiago*, 319 Conn. 540, 545, 125 A.3d 983 (2015).

In his prayer for relief in this appeal from the 2023 commitment order, the acquittee seeks a judgment directing the trial court to deny the state's petition to extend his commitment, which ultimately would have led to his release from the custody of the board. The relief requested from this court is no longer available because the acquittee was released from the board's custody on March 20, 2025. That intervening event has rendered this appeal moot. See, e.g., *State* v. *Kalman*, 88 Conn. App. 125, 141–43, 868 A.2d 766 (challenge to commitment of acquittee to board under maximum security conditions was rendered moot when, during pendency of appeal, board granted hospital's application to transfer insanity acquittee to less restrictive setting), cert. denied, 273 Conn. 938, 875 A.2d 44 (2005);

*Peart* v. *Psychiatric Security Review Board*, 41 Conn. App. 688, 689, 691, 678 A.2d 488 (1996) (same).

The acquittee argues that this appeal should not be dismissed as moot because of the collateral consequences doctrine, and because it also falls within the capable of repetition, yet evading review exception to the mootness doctrine. We disagree.

Under the collateral consequences doctrine, "a case does not necessarily become moot by virtue of the fact that . . . due to a change in circumstances, relief from the actual injury is unavailable. We have determined that a controversy continues to exist, affording the court jurisdiction, if the actual injury suffered by the litigant potentially gives rise to a collateral injury from which the court can grant relief." (Internal quotation marks omitted.) *State* v. *Gomes*, 337 Conn. 826, 839–40, 256 A.3d 131 (2021).

"[F]or a litigant to invoke successfully the collateral consequences doctrine, the litigant must show that there is a reasonable possibility that prejudicial collateral consequences will occur. . . . This standard provides the necessary limitations on justiciability underlying the mootness doctrine itself. [When] there is no direct practical relief available from the reversal of the judgment . . . the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the litigant some practical relief in the future. The reviewing court therefore determines, based [on] the particular situation, whether . . . the prejudicial collateral consequences are reasonably possible." (Internal quotation marks omitted.) Id., 840; see, e.g., *State* v. *McElveen*, 261 Conn. 198, 208, 802 A.2d 74 (2002). It requires more than speculation or conjecture to establish a reasonable possibility that such a collateral consequence will occur. See, e.g., *United Illuminating Co.* v. *Public Utilities Regulatory*

*Authority*, 350 Conn. 660, 674, 325 A.3d 900 (2024); *State* v. *McElveen*, supra, 208.

To establish that his claim falls within the collateral consequences doctrine, the acquittee relies on *State* v. *Jerzy G.*, 326 Conn. 206, 162 A.3d 692 (2017), and on other cases from this court, which, he contends, allow for "a presumption of collateral consequences based [on] the impact of an adverse ruling [on] future litigation or [on] an individual's reputation." The acquittee argues that (1) "there is no question that an erroneous finding of ongoing danger, as recent as 2023, carries stigma that could cast a shadow on [his] efforts to lead a productive life" after his discharge from the custody of the board, and that (2) a decision from this court determining that he "was entitled to . . . discharge in 2023" would provide a "more accurate" representation of his "stability" and lack of dangerousness. The acquittee further argues that, as recognized by the Superior Court in *In re Probate Appeal of Kandjrika*, Docket No. NNH-CV-17-5040765-S, 2018 WL 7046892, *7 (Conn. Super. December 11, 2018), the Department of Mental Health and Addiction Services (department) "maintains a database of individuals who are using or have used its services" and that he "likely will remain in this database, even if [he] no longer utiliz[es] [the department's] services," giving him "an interest in removing the stain of an erroneous finding that he remained dangerously mentally ill."

We acknowledge, as the acquittee argues, that our collateral consequences case law recognizes reputational harm and stigma as an injury that may qualify as a collateral consequence under certain circumstances. Most paradigmatically, such collateral consequences often result from criminal convictions, which carry with them other legal disabilities in addition to the obvious restrictions on the convicted person's freedom in the form of incarceration, parole, probation, and the like.

See, e.g., *State* v. *Jerzy G.*, supra, 326 Conn. 208, 225–26 (probable cause to believe that deported defendant committed sexual assault that led to pending charge was itself "stain" on reputation that would allow for appeal from trial court's order terminating defendant's participation in accelerated rehabilitation program and ordering his rearrest on pending charge); *State* v. *Jordan*, 305 Conn. 1, 10 n.9, 44 A.3d 794 (2012) ("[because] collateral legal disabilities are imposed as a matter of law [as a result] of a criminal conviction, a case will not be declared moot even [when] the [defendant's] sentence has been fully served" (internal quotation marks omitted)); *Putman* v. *Kennedy*, 279 Conn. 162, 164–65, 172, 900 A.2d 1256 (2006) (expiration of domestic violence restraining order did not render appeal from that order moot because "being the subject of a court order intended to prevent or stop domestic violence may well cause harm to the reputation . . . of the defendant"). We also agree with the acquittee that involuntary commitment to a psychiatric hospital on the ground that a person is a danger to oneself or others, which is a fact that might well be documented in the department's database, carries the potential for reputational stigma. See, e.g., *State* v. *Metz*, supra, 230 Conn. 412–13; *In re B.B.*, 826 N.W.2d 425, 429–30 (Iowa 2013).

Nevertheless, we conclude that the collateral consequences doctrine does not save the acquittee's appeal from mootness in the particular circumstances of this case because he has not established that the 2023 commitment order will carry the reasonable possibility of a collateral consequence.[5] We recognize the theoretical

[5] The acquittee focuses his arguments on reputational stigma. We note, however, that an involuntary commitment, including one resulting from an insanity acquittal, may result in the impairment of certain rights, including permanent firearms ownership restrictions applicable to those "adjudicated as a mental defective" or "committed to a mental institution" under 18 U.S.C. § 922 (g) (4). See, e.g., *United States* v. *Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012); *United States* v. *Buffaloe*, 449 F.2d 779, 780 (4th Cir. 1971).

possibility that the extension of commitment at issue in this appeal may still carry collateral consequences, such as additional reputational harm, or possibly may risk creating a perception of "one more strike" against the acquittee in a subsequent case; *State* v. *McElveen*, supra, 261 Conn. 216 n.14; despite the fact that it does not create additional, concrete legal disabilities. See, e.g., *State* v. *Gomes*, supra, 337 Conn. 828, 837–38, 844–45 (defendant's deportation during pendency of his appeal did not render appeal moot given reputational injury from assault conviction); *State* v. *Jerzy G.*, supra, 326 Conn. 221–22 (observing that "other potential sources of prejudice" do not defeat finding of collateral injury unless they are "necessarily dispositive," such as permanent ban from reentering this country due to prior conviction); see also, e.g., *State* v. *McElveen*, supra, 216 n.14, 217–18 (criminal conviction that stemmed from conduct leading to revocation of defendant's probation that was at issue in otherwise moot appeal created "similar prejudicial collateral consequences" but was merely "one more strike against the defendant and [did] not eliminate the collateral consequences arising from the judgment revoking his probation").

Unlike criminal convictions or findings that reasonably can be expected to cause reputational stigma in the first instance, however, the 2023 commitment order at issue in this appeal is an extension of several prior commitments beyond the initial twenty year term, all resulting from the same original source, in this case, a single judgment of acquittal as to all of the index offenses by reason of insanity, rather than from separate, factual predicates. See footnote 4 of this opinion and accompanying text. The extension of commitment reflects a determination of limited duration by the trial court that the need for further supervision had not yet terminated. This determination no doubt infringed on the acquittee's liberty interests until the expiration of

the extended commitment, but we fail to see how it materially increased the stigma associated with his commitment as an insanity acquittee or gave rise to a reasonable possibility of causing him adverse collateral consequences in the future. To the contrary, "[e]very collateral consequence that can be identified already existed as a result of [the acquittee's] previous adjudications . . . ." *In re Alfred H.H.*, 233 Ill. 2d 345, 363, 910 N.E.2d 74 (2009); see, e.g., id., 362–63 (applying case-by-case analysis but concluding that involuntary commitment lacked collateral consequences when "[the] respondent has had multiple [prior] involuntary commitments"). But cf. *In re B.B.*, supra, 826 N.W.2d 432 (observing that "a series of recent, successive involuntary commitments that were either not appealed or upheld on appeal might effectively remove any stigma resulting from a later involuntary commitment proceeding" but concluding that appeal was not moot because "a single and remote prior involuntary commitment" thirteen years before is not "sufficient to eliminate the stigma resulting from the adjudication in [the] case"). Accordingly, we conclude that the collateral consequences doctrine does not save the acquittee's appeal from mootness.[6]

---

[6] We acknowledge the acquittee's concern that the trial court's uncorrected finding of dangerousness in the 2023 commitment order may, in the event of a subsequent civil commitment proceeding, result in "an overreaction by a Probate Court, and an unmerited, potentially lengthy involuntary commitment." We disagree that this concern presents a collateral consequence that saves this appeal from mootness. First, the report that the board filed, pursuant to § 17a-593 (d), in connection with the 2024 petition, which recommended the acquittee's release, has a rehabilitative effect by serving as affirmative evidence that he is no longer a danger as contemplated by § 17a-593 (c) and (g). See, e.g., *State* v. *Kalman*, supra, 88 Conn. App. 143, 144 (concluding that "there [were] no collateral legal consequences" to trial court's order committing insanity acquittee to maximum security setting because "the weight of the [trial] court's findings . . . [was] greatly dissipated by the board's evaluation and determination that the acquittee no longer require[d] maximum security confinement"); *Peart* v. *Psychiatric Security Review Board*, supra, 41 Conn. App. 692 (concluding that "the board's findings that [the insanity acquittee] was an escape risk and [that

We next turn to the acquittee's contention that we should not dismiss this appeal because it presents issues that are capable of repetition, yet evading review. See, e.g., *Loisel* v. *Rowe*, 233 Conn. 370, 382–83, 660 A.2d 323 (1995). It is well established that "[t]he mootness doctrine does not preclude a court from addressing an issue that is capable of repetition, yet evading review. . . . [F]or an otherwise moot question to qualify for review under the capable of repetition, yet evading review exception, it must meet three requirements. First, the challenged action, or the effect of the challenged action, by its very nature must be of a limited duration so that there is a strong likelihood that the substantial majority of cases raising a question about its validity will become moot before appellate litigation can be concluded. Second, there must be a reasonable likelihood that the question presented in the pending case will arise again in the future, and that it will affect either the same complaining party or a reasonably identifiable group for whom that party can be said to act

he] wore symbols of white supremacy," justifying maximum security commitment, will not have collateral legal consequences, given board's subsequent grant of transfer to less restrictive hospital, making it "clear . . . that the findings made by the trial court in its memorandum [of decision] did not adversely affect the [acquittee]"). Second, whether such a civil commitment proceeding will occur at all is a matter of speculation and conjecture, especially given the board's most recent report in connection with the 2024 petition. In the event that such a proceeding may occur at some point in the future, the appellate review process is available to remedy any potential "overreaction" by a Probate Court. See, e.g., *United Illuminating Co.* v. *Public Utilities Regulatory Authority*, supra, 350 Conn. 663, 673–75 (no reasonable possibility of collateral consequences for electric distribution company given representation by government agency's counsel that agency had no intention of relying on proceedings that agency had initiated to address deficiencies in company's preparedness and response to tropical storm in any future storm investigations and in light of determination by agency that company had corrected most cited deficiencies). Finally, "[a]lthough it flows from, rather than contributes to, our mootness analysis . . . because we are directing the vacatur of [the 2023 commitment order] . . . any possibility of collateral consequences attendant to, or arising from, that order is eliminated." (Citation omitted.) Id., 674 n.8.

as surrogate. Third, the question must have some public importance. Unless all three requirements are met, the appeal must be dismissed as moot." (Internal quotation marks omitted.) *CT Freedom Alliance, LLC* v. *Dept. of Education*, 346 Conn. 1, 13, 287 A.3d 557 (2023).

We agree with the acquittee that his appeal raises significant legal issues regarding § 17a-593 (c) that, by their nature, are of limited duration, such that they may sometimes evade appellate review. Nevertheless, the acquittee's capable of repetition, yet evading review argument founders on the durational element because the time required to adjudicate these matters is not so limited that there is a strong likelihood that appellate review will be unavailable in the substantial majority of cases. This durational factor "reflects the functionally insurmountable time constraints present in certain types of disputes. . . . Paradigmatic examples are abortion cases and other medical treatment disputes." (Internal quotation marks omitted.) *In re Emma F.*, 315 Conn. 414, 425, 107 A.3d 947 (2015); see also, e.g., id., 428 ("[s]heer public importance . . . cannot remedy a failure to satisfy the other components of the capable of repetition, yet evading review exception to the mootness doctrine" (internal quotation marks omitted)). As the acquittee observed in his primary brief, unlike cases in which the challenged action would expire before an appeal could be addressed, there is no time limitation on the length of a continued commitment inherent in § 17a-593 (c) or any other statutory provision. Thus, because there is no limitation on how long an extension of commitment could be, and, as in this case, the state and an acquittee may well consent to further extensions during the course of an appeal, there is no strong likelihood that a substantial majority of cases challenging an extension of commitment will become moot before appellate litigation can be concluded.

Moreover, to the extent that a commitment extension in a particular case is short enough that mootness may be expected to occur during the ordinary course of appellate review, existing procedures may be utilized to facilitate timely appellate review of such an extension. See, e.g., *CT Freedom Alliance, LLC* v. *Dept. of Education*, supra, 346 Conn. 18–19 (noting that parties may "[enlist] the help of the appellate courts" to ensure that case is "live," including resort to expedited review procedures, such as petitions to Chief Justice pursuant to General Statutes § 52-265a); *In re Emma F.*, supra, 315 Conn. 426–27 (discussing expedited review procedures for "appellate relief," including "implementing an expedited briefing, argument, and decision procedure").

Neither the collateral consequences doctrine nor the capable of repetition, yet evading review exception allows us to reach the merits of this appeal, and, therefore, we must dismiss the appeal as moot. Nevertheless, we agree with the acquittee's contention that we should "remove the stain" of the otherwise moot 2023 commitment order, and we now consider whether to vacate it.[7]

"Vacatur is commonly utilized . . . to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences. . . . In determining whether to vacate a judgment that is unreviewable because of mootness, the principal issue is whether the party seeking relief from [that] judgment . . . caused the mootness by voluntary action. . . . A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment. . . . The same is true when mootness results from unilateral action of the party who prevailed below." (Internal quo-

---

[7] Although the acquittee's request that we "remove the stain" of the 2023 commitment order is not entirely clear, potentially because our supplemental briefing order did not raise the subject, we construe his request as asking us to vacate that order.

tation marks omitted.) *United Illuminating Co.* v. *Public Utilities Regulatory Authority*, supra, 350 Conn. 675. Application of the doctrine of vacatur eliminates the possibility, "however remote" or "unlikely," that an otherwise moot decision might implicate some "lingering" or "residual" harm for the appellant, despite the lack of reasonably possible collateral consequences that otherwise would save the appeal from mootness. (Internal quotation marks omitted.) *Private Healthcare Systems, Inc.* v. *Torres*, 278 Conn. 291, 304, 898 A.2d 768 (2006); see also, e.g., *United Illuminating Co.* v. *Public Utilities Regulatory Authority*, supra, 677.

In this respect, we find instructive the Appellate Court's recent decision in *In re Rabia K.*, 212 Conn. App. 556, 275 A.3d 249 (2022). In *In re Rabia K.*, a child protection appeal, the Appellate Court concluded that a respondent mother's appeal from a neglect finding was rendered moot when the trial court revoked the commitment of the child to the custody of the Commissioner of Children and Families; id., 558; meaning that, "[b]ecause the underlying case ha[d] been closed and [the child] ha[d] been returned to the care and custody of the respondent, an actual controversy no longer exist[ed]." Id., 561. The Appellate Court then determined that there were no collateral consequences to save the appeal from mootness because there was no reasonable possibility that "an adjudication of neglect could be used against [the respondent] in a future child protection proceeding," given that the child was about to turn eighteen years old. Id., 562.

Nevertheless, recognizing that the appeal had been rendered moot by no fault of the respondent, the Appellate Court concluded that, "under the unique circumstances of [that] case . . . vacatur [was] appropriate in order to avoid the possibility—however remote—of collateral consequences for the respondent . . . ." Id.; see also, e.g., *In re Yassell B.*, 208 Conn. App. 816,

822–25, 267 A.3d 316 (2021) (vacating Connecticut trial court's decision affording full faith and credit to New York court's determination that appellant was not legal father of child when his appeal was rendered moot by resolution of underlying neglect proceeding because appellant "did not cause [the] appeal to become moot through any voluntary action," and because "it would be unfair to [the appellant] to bind him to a judgment that he ha[d] challenged but, through no fault of his own, [could not] contest"), cert. denied, 340 Conn. 922, 268 A.3d 77 (2022).

Although the acquittee has not established that the 2023 commitment order presents a reasonable possibility of collateral consequences under the facts of this case, the vagaries of time and the improvement in his mental health have operated to preclude him from challenging that order through no fault of his own, given the state's withdrawal of the pending 2024 petition in response to the report that was filed by the board pursuant to § 17a-593 (d). Acknowledging that the state has acted with the utmost candor and professionalism in withdrawing the 2024 petition in light of the board's report; see Rules of Professional Conduct 3.8 and commentary; we nevertheless believe that the acquittee should be relieved of any possibility of any lingering or remote consequences from the 2023 commitment order, requiring that we vacate that order.[8]

---

[8] Recognizing the public interest in judicial precedents, we typically have been more apt to vacate erroneous Appellate Court decisions than trial court decisions because of their binding precedential effect. See, e.g., *In re Jorden R.*, 293 Conn. 539, 557–58, 979 A.2d 469 (2009); *Private Healthcare Systems, Inc.* v. *Torres*, supra, 278 Conn. 303–305; *In re Candace H.*, 259 Conn. 523, 527 and n.5, 790 A.2d 1164 (2002); see also, e.g., *State* v. *Charlotte Hungerford Hospital*, 308 Conn. 140, 145 and n.6, 60 A.3d 946 (2013). Because they lack binding precedential value, we have been less apt to vacate trial court decisions in moot appeals, unless some preclusive effect was identified. See, e.g., *In re Emma F.*, supra, 315 Conn. 431–33. In the present case, the concerns identified by the acquittee tend to be more preclusive than merely precedential in nature, rendering vacatur of the 2023 commitment

The appeal is dismissed and the July 11, 2023 commitment order is vacated.

In this opinion the other justices concurred.

_____

order appropriate. See, e.g., *In re Yassell B.*, supra, 208 Conn. App. 824 n.3; see also, e.g., *State* v. *Charlotte Hungerford Hospital*, supra, 145.